**In the United States District Court
for the District of Kansas**

---

Case No. 24-cr-40015-TC

---

UNITED STATES OF AMERICA,

*Plaintiff*

v.

BRUCE LE, ET AL.,

*Defendants*

---

### MEMORANDUM AND ORDER

    A grand jury indicted Bruce Le and Vinicius Souza Diniz for one count of possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1). Doc. 1. Defendants now move to suppress physical evidence seized during a traffic stop and the statements they made to law enforcement during and after that stop. Docs. 34, 36, 37. For the following reasons, Defendants' motions are granted.

### I

### A

    The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; *see also New Jersey v. T.L.O.*, 469 U.S. 325, 334 (1985) (recognizing incorporation against the states). Absent a recognized exception, the Fourth Amendment prohibits suspicionless seizures or warrantless searches that violate a person's objectively reasonable expectation of privacy by invading a constitutionally protected space or thing. *United States v. Jones*, 565 U.S. 400, 406 (2012); *see also United States v. Ackerman*, 831 F.3d 1292, 1307 (10th Cir. 2016).

As noted below, the defendants challenge the lawfulness of their encounter with law enforcement at a variety of points throughout the encounter. The following briefly highlights the general rules governing their interaction with law enforcement.

Traffic stops are seizures for Fourth Amendment purposes, *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015), and in a traffic stop "a passenger is seized as well and so may challenge the constitutionality of the stop." *Brendlin v. California*, 551 U.S. 249, 251 (2007). A warrantless stop is valid where the officer has reasonable suspicion to believe that a traffic violation occurred. *Kansas v. Glover*, 589 U.S. 376, 380 (2020). In particular, the officer must have "a reasonable articulable suspicion that 'this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction.'" *United States v. Martinez*, 512 F.3d 1268, 1272 (10th Cir. 2008) (quoting *United States v. Ozbirn*, 189 F.3d 1194, 1197–98 (10th Cir. 1999)). The stop also must be "reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Morales*, 961 F.3d 1086, 1090–91 (10th Cir. 2020). Officers may only conduct unrelated inquiries during a stop if that conduct does not prolong the stop. *United States v. Frazier*, 30 F.4th 1165, 1173 (10th Cir. 2022) (citing *Rodriguez v. United States*, 575 U.S. 348, 355 (2015)). Once the mission of the stop has concluded, the motorist is generally free to leave. *Morales*, 961 F.3d at 1091.

There are at least two circumstances in which continued questioning of a stopped motorist may occur. *Id.* One involves the development of reasonable suspicion to investigate other crimes, such as when an officer has reason to believe the individual may be engaging in drug trafficking. *Frazier*, 30 F.4th at 1174. "Reasonable suspicion" is "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Glover*, 589 U.S. at 380 (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). The inquiry depends on "the totality of the circumstances." *Navarette v. California*, 572 U.S. 393, 397 (2014) (quoting *Cortez*, 449 U.S. at 417). The emphasis is on the "whole picture," *Cortez*, 449 U.S. at 417, and rejects a "divide-and-conquer analysis" of a situation's relevant factors. *United States v. Arvizu*, 534 U.S. 266, 274 (2002). While a mere "hunch" is not enough, "the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Navarette*, 572 U.S. at 397

(quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)) (quotation marks omitted).

Another involves implied consent. "A consensual encounter is the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement officer." *United States v. Mercado-Gracia*, 989 F.3d 829, 836 (10th Cir. 2021). Officers often attempt to transform a stop into a consensual encounter through what is known as the Kansas two-step: The officer returns the driver's documents, says "thank you," "have a nice trip," or otherwise indicates the stop has concluded, disengages by taking two steps away, and then begins to ask the driver additional questions. *See United States v. Murdoch*, No. 23-40037, 2025 WL 564195, at *9 n.5 (D. Kan. Feb. 20, 2025). When determining whether this type of encounter is consensual, the focus is on police conduct—specifically, whether it "would have conveyed to a reasonable person that he or she was not free to decline the officer's requests or otherwise terminate the encounter." *Id.* (quoting *Bradford*, 423 F.3d at 1158).

As a general matter, the authority to detain a motorist while investigating the reasonable suspicion does not include the right to search the vehicle absent either consent or probable cause. *United States v. Forbes*, 528 F.3d 1273, 1277–78 (10th Cir. 2008). Valid consent to conduct a search of a vehicle exists where "a person in control of the vehicle has given his voluntary consent to the search." *United States v. Lyons*, 510 F.3d 1225, 1239 (10th Cir. 2007). In determining voluntariness, courts consider the totality of the circumstances, just as for determining whether a police encounter was consensual. *United States v. Harrison*, 639 F.3d 1273, 1278 (10th Cir. 2011). Once a motorist has consented to a search, that consent extends to the entire vehicle, *United States v. Rosborough*, 366 F.3d 1145, 1150 (10th Cir. 2004), and any closed containers within it, *United States v. Mendoza*, 817 F.3d 695, 701 (10th Cir. 2016). The consenting party may avoid this by explicitly limiting the scope of the search. *Mendoza*, 817 F.3d at 701. In addition, the driver may withdraw previously granted consent if the withdrawal is "expressly and explicitly made." *United States v. Manjarrez*, 348 F.3d 881, 888 (10th Cir. 2003).

Probable cause may also give rise to authority to conduct a search. *United States v. West*, 219 F.3d 1171, 1178 (10th Cir. 2000). "Probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence." *United States v. Phillips*, 71 F.4th 817, 823 (10th Cir. 2023)

(quoting *United States v. Vasquez-Castillo*, 258 F.3d 1207, 1212 (10th Cir. 2001)). Probable cause is not a high bar. *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1220 (10th Cir. 2020) (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)). It demands "only the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *Id.* (quoting *Kaley*, 571 U.S. at 338).

**B**

On December 7, 2022, Deputy Alexander Wright of the Geary County Sheriff's Office positioned his patrol vehicle in the median of Interstate 70 at mile-marker 290.[1] As he observed traffic headed eastbound, he saw a white Sentra travelling in the left lane. Wright's viewpoint focused northbound—perpendicular to the interstate—so he first observed the Sentra the moment it passed where he was sitting at mile-marker 290. At that point, Wright turned his head to the left to continue observing the Sentra as it traveled eastbound. He watched it "travel in the left lane for approximately another quarter mile." Doc. 43 at 2.[2] Based on that quarter-mile observation, he decided to follow the Sentra.

The dashcam footage from Wright's patrol vehicle provides additional context. Five seconds after the Sentra passed mile-marker 290, another vehicle passed the same location. That other vehicle was travelling in the right lane. But Wright did not see that vehicle because he was still watching the Sentra as it headed east. Within a few seconds, another vehicle travelling in the right lane passed too. At that point, Wright was already pulling out from the median to catch up to the Sentra. Wright saw the Sentra move to the right lane as he pulled out of the median, and it remained in the lane while Wright was following it.

Wright initiated a traffic stop of the Sentra for violating a Kansas statute that generally prescribes operating a motor vehicle in the right-hand lane, K.S.A. § 8-1522(c). It states, in material part, as follows:

---

[1] The following facts were found based on the witnesses' testimony and the evidence produced at the suppression hearing.

[2] All document citations are to the document and page number assigned in the CM/ECF system.

4

> Upon a highway located outside the corporate limits of any city divided into two lanes of traffic proceeding in the same direction, all vehicles shall be driven in the right lane except when: (1) Overtaking and passing another vehicle; (2) preparing to make a proper left turn; (3) otherwise directed by official traffic-control devices; or (4) otherwise required by other provisions of law.

Kan. Stat. Ann. § 8-1522(c)(1)–(4).

Once the Sentra had stopped, Wright approached the passenger window and encountered two passengers. Le was seated in the passenger seat and Souza Diniz in the driver's seat. Wright told Defendants that he pulled them over for continuously driving in the left lane even though they were not moving over or passing.

Wright collected Defendants' driver's licenses. He also discovered that they were driving a rental vehicle. Le informed Wright that Le's cousin had rented the Sentra. Le, who had the rental agreement on his phone, showed the agreement to Wright. Wright reviewed it, then asked Souza Diniz to step outside the car so that Wright could ask him more questions.

Wright talked to Souza Diniz outside of the patrol vehicle for over seven minutes. He asked about Defendants' travel plans, Souza Diniz's work, and how he and Le know each other. Souza Diniz told Wright that the two were high-school best friends. Souza Diniz made a last-minute decision to join Le on his trip to California to celebrate Le's birthday. They both planned to drive from California to Massachusetts where they both lived, creating social-media content to support their business along the way. Le flew to California first and stayed with his family. Then, on Sunday, December 4, Souza Diniz flew to California. The two stayed with one of Le's family members for one night before starting their road trip back to Massachusetts the next day. They stopped in Colorado for one day and were on their way to Kansas City, Missouri when Wright initiated the traffic stop. In a calm and conversational manner, Souza Diniz also talked to Wright about his content-creation business, his social media accounts, and fitness.

During this conversation, Wright was simultaneously filling out a form on a clipboard that he called his "citation book." At one point, Wright called in Defendants' information to dispatch. He discovered

5

that Le's driver's license had expired but did not learn any other details suggesting either Souza Diniz or Le had warrants or criminal history. Wright also asked a second officer, Deputy Thomas Umek, to talk to Le—who was still in the Sentra—while Wright talked to Souza Diniz. Wright then asked Souza Diniz to continue standing outside while Wright entered his patrol vehicle to gather more information. In the patrol vehicle, Wright conducted stop-related activities on his computer and continued filling out his citation book.

A few minutes later, Wright returned to stand outside the patrol vehicle with Souza Diniz. By then, Umek had also joined Souza Diniz outside. Wright told Souza Diniz that he was only giving him a warning for driving in the left lane. The two officers asked Souza Diniz a few more questions about what he and Le were doing in Kansas and what they do for work. Wright then gave the warning to Souza Diniz, returned both Le's and Souza Diniz's driver's licenses to Souza Diniz, and said, "Alright man, here's that. Like I said, just a warning. No fines, no court." Immediately after, Wright said, "So, I'm done with my stop … I've got a couple more questions though. Are you cool to talk for a minute?" Souza Diniz replied, "Yeah."

Wright explained that he had suspicions of drug trafficking. He mentioned that Defendants were travelling in a one-way rental vehicle and that neither Defendant was listed as an authorized driver on the rental agreement. He began asking Souza Diniz if various illegal substances were in the car, listing them off one at a time. During the conversation, Wright asked Souza Diniz if he could search the Sentra. Souza Diniz replied, "Yeah, if you'd like." A few seconds later, Souza Diniz told Wright to check with Le before searching too. Wright stated, "I mean, you're the driver. The person who rented the car is not here." Wright then explained to Souza Diniz that his job is to "catch people transporting narcotics" on the highway and that Defendants' story "seem[ed] a little off." Then, he asked Souza Diniz if anything was in the vehicle that should not be there. Diniz said, "No. Well, um, there might be some weed." He then told Wright that if there were weed in the vehicle, it would be in the front.

Wright approached the vehicle, where Le was still sitting inside the car. Wright asked Le if anything illegal was inside the car, and Le denied that there was. Wright informed Le that Souza Diniz had consented to a search of the vehicle and asked Le if he had bags in the Sentra that he did not want to be searched. Le requested that Wright not search anything in the vehicle. Before Wright searched the vehicle, Le showed

6

Wright marijuana and said, "This is the only thing I have." Wright told Le that the marijuana gave him probable cause to search the car.

Wright and Umek searched the vehicle. They found several bags of marijuana products and twenty vacuum sealed bags containing forty-five pounds of suspected methamphetamine. Doc. 38 at 8. Souza Diniz and Le were both arrested. Wright read Souza Diniz his *Miranda* rights outside the patrol vehicle, and he testified that he read Le's *Miranda* rights to him when they arrived at the police station.

Following their arrest, a grand jury indicted Souza Diniz and Le on one count of possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1). Doc. 1. Defendants now move to suppress the evidence seized from the Sentra on several grounds. Docs. 34 & 37. They argue that Wright lacked reasonable suspicion to initiate the traffic stop, unreasonably prolonged the traffic stop without consent or reasonable suspicion that ongoing criminal activity was occurring, and that Wright did not have consent or probable cause to search the vehicle. Docs. 35 & 37. The Government opposes each argument and asserts that Defendants lack Fourth Amendment standing to seek suppression. Doc. 43. These arguments were fully addressed at an evidentiary hearing that spanned two days. Docs. 48 & 50.

## II

Defendants' motions to suppress are granted. Deputy Wright lacked reasonable suspicion to initiate a traffic stop. As a result, all evidence obtained following the stop must be excluded.

## A

As should be obvious from a description of the encounter, this case presents a myriad of interrelated Fourth Amendment issues. The parties agree that the first sequential question is whether Wright had the requisite reasonable suspicion to initiate a traffic stop based on what he observed. Doc. 35 at 7–12; Doc. 38 at 9. If so, the next is whether Wright unlawfully prolonged the stop by deviating from its traffic-based mission in violation of *Rodriguez v. United States*, 575 U.S. 348 (2015). Doc. 35 at 12–13; Doc. 38 at 10–14. In addition, the parties dispute whether Wright's encounter with Diniz became consensual after Wright returned the defendants' driver's licenses to Souza Diniz but immediately asked Souza Diniz if he could ask him more questions, Doc. 35 at 12–15; Doc. 38 at 14–19, and, if not, whether Wright had

reasonable suspicion to suspect drug trafficking to continue detaining the defendants, Doc. 35 at 15–19. Yet even these issues had disputed questions of Wright's authority to conduct a search of the vehicle, including whether Souza Diniz withdrew consent when he asked Wright to obtain permission from Le to search the vehicle, whether Le's denial of consent overcame Souza Diniz's initial consent, and at what point Wright developed probable cause to search the Sentra.

This case is further complicated by Fourth Amendment standing concerns. Doc. 43 at 8–13. Defendants have standing to seek suppression as a result of an unlawful stop. *United States v. DeLuca*, 269 F.3d 1128, 1131–32 (10th Cir. 2001) (explaining that any occupant in a stopped vehicle may challenge the lawfulness of the detention and seek suppression of the fruits of the unlawful detention). But for all subsequent interactions, Defendants' ability to show that "a factual nexus exists between his unlawful seizure and detention and the challenged evidence" is a necessarily fact-specific inquiry that may be different depending on which portions of the stop may be unlawful. *See United States v. Mosley*, 743 F.3d 1317, 1323 (10th Cir. 2014). And it is likely that the standing analysis differs not only for each part of the post-stop encounter, but also between the two Defendants and their respective interests. *DeLuca*, 269 F.3d at 1131 ("Fourth Amendment rights are personal, and, therefore, a defendant cannot claim a violation of his Fourth Amendment rights based only on the introduction of evidence procured through an illegal search and seizure of a third person's property or premises."). Le and Souza Diniz both must show they have standing to seek suppression. *Id.*

Most of these difficult legal questions implicated can be avoided. In particular, Wright did not have reasonable suspicion to initiate the traffic stop of the Sentra, making the stop unlawful from the moment it started. The parties agree both Defendants have standing to challenge the stop and seek the suppression of the evidence found during the search of the Sentra as the fruit of their unlawful detention.[3] And

---

[3] The Government's brief appeared to initially assert that Le and Souza Diniz could not seek suppression "on the basis that they were unlawfully detained." Doc. 43 at 13. But a closer read confirms that this argument was premised on the notion that the initial stop was lawful. *See id.* And the Government agreed at the evidentiary hearing that, consistent with *DeLuca*, both Defendants are entitled to suppression of all fruits of the stop if the initial stop was unlawful.

because the Government concedes that the exclusionary rule applies, suppression is proper.

**B**

Wright lacked reasonable suspicion to believe the Sentra he momentarily saw in the left lane violated Kansas law. As a result, the stop violated the Fourth Amendment.

**1.** Wright initiated a traffic stop of the Sentra based on K.S.A. § 8-1522(c). That statute requires drivers to travel in the right lane outside of city limits unless one of four exceptions applies. Kan. Stat. Ann. § 8-1522(c). Those exceptions are when a driver is "overtaking and passing" other vehicles, "preparing to make a proper left turn," when traffic-control devices direct the driver to travel in the left-hand lane, or when other provisions of law require it. *Id.*

Wright observed the Sentra travelling in the left lane for a quarter mile "with no other traffic around." Doc. 43 at 18. According to Wright, this observation sufficiently provided him reasonable suspicion that a traffic violation was occurring. Defendants argue that dashcam video refutes that contention in that the Sentra was still in the process of overtaking and passing the vehicles in the right lane that passed Wright's patrol vehicle several seconds after the Sentra. Doc. 35 at 10–11. Wright testified that he did not see those vehicles because he was watching the Sentra.

The video evidence and testimony offered confirm that Wright lacked reasonable suspicion to believe that the Sentra violated K.S.A. § 8-1522(c). This conclusion is based on Wright's limited knowledge of the traffic surrounding the Sentra, the limited time in which he observed the vehicle, and his inability to determine how long the Sentra remained in the left lane.

It is important to understand the limited aperture through which Wright saw the Sentra. He testified that the spot at which he was parked was at the bottom of a hill, which would have allowed him to see any traffic cresting that hill and driving down the hill from his right to his left. He testified that had he been looking, he could have seen the Sentra as it crested that hill and had at least 300 yards of observation of the vehicle as it approached his position, and then watched the vehicle as it travelled away from him. But he was not looking in that direction when the Sentra crested the hill. As a result, Wright testified

9

that he had no information about the Sentra's path until it was immediately in front of him and even then was only able to view it as it went approximately one-quarter mile past his location. Importantly, Wright disclaimed any knowledge or awareness of any vehicles in the other lanes or anything that may have induced the Sentra to be travelling in the left lane until several seconds after the Sentra first passed Wright's location.

The distance of travel in the left lane is an important consideration. The Kansas Supreme Court has never construed Section 8-1522(c) so as to provide a definitive answer as to what conduct offends that provision. It is therefore necessary to "predict how the court would interpret the code in light of [state] appellate court opinions, decisions from other jurisdictions, statutes, and treatises." *United States v. DeGasso*, 369 F.3d 1139, 1145–46 (10th Cir. 2004). (internal quotations omitted). Two cases, in particular, have concluded that reasonable suspicion exists warranting a traffic stop based on Section 8-1522(c) after observing a vehicle driving in the left lane without justification for up to two or three miles. *United States v. Alvarado*, No. 14-10050, 2014 WL 2711910, at *1 (D. Kan. June 16, 2014) (two miles); *State v. Arceo-Rojas*, 458 P.3d 272, 281 (Kan Ct. App. 2020) (three miles). And a District of Kansas decision, *Shaw v. Jones*, 683 F. Supp. 3d 1205 (D. Kan. 2023), described a stop for this traffic violation as pretextual where the vehicle traveled in the left lane for twenty-five seconds when it could have safely moved to the right lane. Considering the distance alone, it seems unlikely that driving in the left lane for no more than a quarter mile violates Section 8-1522(c).

Considerations other than just distance travelled matter, too. Several cases have included testimony that the detaining officer was able to observe additional contextual clues as to whether the travel was consistent with Section 8-1522(c), including whether any of the exceptions applied. For example, in *Arceo-Rojas*, the officer observed that the vehicle in the left lane was travelling at the same speed and sometimes slower than the vehicle travelling beside it in the right lane. *Arceo-Rojas*, 458 P.3d at 281–82. This allowed the officer to reasonably believe that the driver was unlawfully lingering in the left lane without a lawful reason to do so. *Id.; see also United States v. Aispuro*, No. 13-10036, 2013 WL 3820017, at *1 (D. Kan. July 24, 2013) (finding that an officer had reasonable suspicion that a driver violated Section 8-1522(c) where the car "was not gaining on or passing" another vehicle "but was traveling along behind it in the left lane"). In another case, *State v. Shimer*, No.

122,409, 2021 WL 4352529 (Kan. Ct. App. 2021), the court found reasonable suspicion where the officer observed the vehicle "driving in the left-hand lane with no other vehicles in close proximity." *Id.* at 9. The officer in *Shimer* saw another vehicle in the right lane that was "a significant distance in front of the car driven by the defendant," which allowed the officer to reasonably conclude that the driver was not overtaking or passing another vehicle. *Id.*

The scene surrounding the Sentra's travel is meaningfully different. Wright observed the Sentra travelling in the left lane for a brief moment, and, for that reason alone, initiated a traffic stop. *Cf. State v. Robinson*, No. 122,559, 2021 WL 5992034, at *5 (Kan. Ct. App. 2021) (explaining that law enforcement officers charged with enforcing Section 8-1522(c) have the ability to "objectively determine whether a driver is in the left lane to pass or make a left turn based on context and indicators like a turn signal, distance, speed, whether there are other cars in the right lane, or whether there is a place to turn left"). Although Wright's dash camera video showed two cars travelling in the right lane only seconds behind the Sentra, Wright claims to have seen no other vehicles until several seconds after he began to observe the Sentra. And their placement on the road—having just crested a hill—precluded Wright from determining whether the Sentra was lingering in the left lane or had just overtaken the two cars. Indeed, that the Sentra had returned to the right lane by the time Wright left his position at the median to follow it suggests that Wright was basing his decision solely on the happenstance of observing the Sentra in the left lane at the moment it passed his observation point. That is insufficient to establish reasonable suspicion.

The objective facts surrounding the traffic stop confirm that Wright lacked reasonable, articulable suspicion to believe the driver of the Sentra was violating Section 8-1522(c).[4] Reasonable suspicion requires more than "[i]nchoate suspicions and unparticularized hunches." *United States v. Simpson*, 609 F.3d 1140, 1147 (10th Cir. 2010). Yet Wright's stop of the Sentra appears to be based on merely a hunch that Defendants were violating Kansas traffic law in the hopes that he

---

[4] An officer's objectively reasonable mistake of law can provide the reasonable suspicion that is necessary to initiate a traffic stop. *Heien v. North Carolina*, 574 U.S. 54, 57 (2014). At the suppression hearing, the Government expressly disclaimed making any argument that Wright's reasonable suspicion rested on a mistake of law under *Heien*.

11

might uncover additional criminal conduct. That is foreclosed by binding precedent. *See Brendlin v. California*, 551 U.S. 249, 263 (2007) (noting that arbitrary traffic stops "would be a powerful incentive to run the kind of 'roving patrols' that would still violate the driver's Fourth Amendment right"); *see also City of Indianapolis v. Edmond*, 531 U.S. 32, 44 (2000) (finding that a narcotics checkpoint violated the Fourth Amendment because it was "justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime"). As a result, it violated the Fourth Amendment.

**2.** Wright's testimony forces the Government to effectively construe Section 8-1522(c) as one imposing strict liability. Doc. 43 at 18; Doc. 49 at 16. That effort is both atextual and would lead to absurd results. *DeGasso*, 369 F.3d at 1147 (relying on the statutory text as a whole and avoiding absurd results when predicting how a state supreme court would interpret its traffic law). For one thing, the statute itself does not impose liability any time there is travel in the left lane; it provides circumstances that permit lawful travel in the left lane. And Wright failed to provide any basis to believe that none of these circumstances applied. Indeed, as noted, the dashcam video suggests at least one of them likely applied.

Moreover, such a construction would be akin to a "heads-I-win-tails-you-lose" scenario that would permit a stop of nearly every motorist. Kansas has specific statutes that regulate how close a vehicle can be to the vehicles in front of it, how long a vehicle may remain in the left lane after overtaking the vehicle, and then how quickly the vehicle must return to the left lane. Kan. Stat. Ann. §§ 8-1523 (prohibiting drivers from following other vehicles too closely), 8-1516 (precluding drivers from switching lanes before it is safely clear to do so). If the Government's position prevailed, nearly every Kansas driver would be at risk of violating—or being accused of violating—one of three state laws at all times regardless of the road and traffic conditions. Unless and until such a construction is provided by the Kansas Supreme Court, it seems more likely that Kansas traffic laws eschew the logic the Government's argument offers. *See Jordan v. Maxim Healthcare Servs., Inc.*, 950 F.3d 724, 740 (10th Cir. 2020) (favoring a reasonable construction of state law); *accord* A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 234–36 (2012) (explaining that reasonable interpretations of statutes are favored over unreasonable ones).

## C

That the vehicle was unlawfully stopped is only part of the inquiry. The next step is to determine how to proceed. As the Tenth Circuit recently recognized, the exclusionary rule has been the principal judicial remedy to deter Fourth Amendment violations for decades. *See generally United States v. Elmore*, 101 F.4th 1210, 1220 (10th Cir. 2024) (quoting *Utah v. Strieff*, 579 U.S. 232, 237 (2016)). Many jurists and scholars have suggested that exclusion is a last resort sort of remedy for a good many reasons, not the least of which is that "[e]xclusion exacts a heavy toll on both the judicial system and society at large" and "almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence." *Davis v. United States*, 564 U.S. 229, 237 (2011). This case embodies that concern: Both defendants were transporting more than forty pounds of methamphetamine across the country and, if that evidence is excluded, it will likely "set the [defendants] loose in the community without punishment." *Id.*

While there may be a number of reasons to argue suppression is not the appropriate remedy, the Government makes none of them in this case. As a result, the evidence obtained following Wright's unlawful stop of the Sentra must be suppressed. *Elmore*, 101 F.4th at 1222-23 (applying exclusionary rule to unlawfully obtained evidence).

## III

For the foregoing reasons, Defendants' Motions to Suppress Evidence, Docs. 34, 36 and 37, are GRANTED.

It is so ordered.

Date: April 11, 2025                     s/ Toby Crouse
                                         Toby Crouse
                                         United States District Judge

13